WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>  Plaintiff,<br><br>v.<br><br>Loren Joel McReynolds,<br><br>  Defendant. | No. CR-19-8245-01-PCT-DGC<br><br>**ORDER** |

Self-represented Defendant Loren Joel McReynolds has filed a Motion to Suppress (Doc. 113) and a Motion to Dismiss (Doc. 112). The motions are fully briefed, and the Court held a video hearing, with Defendant's consent and participation, on September 23, 2020. The Court will deny both motions.

**I.     Motion to Suppress (Doc. 113).**

Defendant asks the Court to suppress various categories of evidence. His arguments are at times overlapping and difficult to follow, and he makes a number of new arguments in his reply brief. The Court will do its best to address the various issues he raises.[1]

---

[1] The Court directed Defendant, through shadow counsel, to file in the Court's electronic docket copies of the exhibits that were provided directly to chambers. The exhibits have not been filed electronically, but recently were delivered in paper form to the Clerk's office. The Court will return the paper copies to shadow counsel with instructions to scan them and lodge them in the Court's electronic docket. This order will cite to the exhibits contained in the two green binders that were delivered to chambers. The Court will cite exhibits to the Motion to Dismiss as MTD Ex. __, and exhibits to the Motion to

**A.     January 2017 Search Warrant.**

On January 12, 2017, agents obtained a warrant from the Coconino County Superior Court to search Defendant and his truck. The warrant stated that the search was to be completed within five calendar days. MTS Ex. 1 at 000175.[2] The search was conducted the next day, on January 13, 2017 (MTS Ex. 3), and a cell phone, digital storage devices, and camera were seized. Defendant contends that agents violated the warrant by imaging these devices and extracting information from the images more than five days after the warrant was issued. The Court does not agree.

The warrant stated that the "search" needed to be completed within five days. MTS Ex. 1 at 000175. It did not place a time limit on extraction of information from the devices, a step the warrant identified separately from the search. *See id.* (authorizing agents "[t]o search, seize, make copies of and perform extractions . . ."). And as this Court has held, "courts generally have recognized that the seizure of computer information pursuant to a search warrant requires off-site examination of the computer's contents, a process that can take considerable time given the storage capacity of modern computers. Several courts have expressly concluded that neither [Federal Rule of Criminal Procedure 41] nor the Fourth Amendment imposes a time constraint on the efforts of government agents to examine computer contents seized pursuant to a valid search warrant." *United States v. Rigmaiden*, No. CR 08-814-PHX-DGC, 2013 WL 1932800, at *27 (D. Ariz. May 8, 2013) (citing cases). Plaintiff has identified no Arizona law that places a time limit on extractions, and the Court has found none.

Courts generally hold that the government has a reasonable time to search digital devices and computers after seizing them. *See United States v. Cleveland*, 907 F.3d 423, 431 (6th Cir. 2018) (the "execution date set a deadline only for when the physical cellphone

---

Suppress as MTS Ex. __. The Court will maintain the two green binders in the Clerk's office. When shadow counsel lodges electronic copies of the exhibits, they should bear the same exhibit numbers as the binders and should be lodged separately for each motion.

[2] If the exhibits have Bates numbers, the Court will cite those numbers. If they do not, the Court will cite page numbers counting from the front of the exhibit.

itself had to be seized, and not for when its data were to be extracted"); *United States v. Johnston*, 789 F.3d 934, 941-42 (9th Cir. 2015) (rejecting challenge where law enforcement conducted preliminary review during execution period but waited five years to conduct full forensic examination); *United States v. Mutschelknaus*, 564 F.Supp.2d 1072, 1076 (D.N.D. 2008) ("Neither Fed. R. Crim. P. 41 nor the Fourth Amendment provides for a specific time limit in which a computer may undergo a government forensic examination after it has been seized pursuant to a search warrant."); *United States v. Grimmett*, No. 04–40005–01–RDR, 2004 WL 3171788, at *5 (D. Kan. 2004) ("The Fourth Amendment does not provide a specific time in which a computer may be subjected to a government forensic examination after it has been seized pursuant to a search warrant."); *United States v. Syphers*, 296 F.Supp.2d 50, 58 (D.N.H. 2003) (denying defendant's motion to suppress search of computer contents when search was completed seven months after seizure because time frame was not unreasonable and state did not "overstep any constitutional boundaries"). Defendant has not shown that the extractions from his cell phone and other devices exceeded a reasonable time.

Defendant also contends that the warrant is invalid because it was issued on January 12, 2017, but the supporting affidavit was not filed with the court until January 18, 2017. Doc. 113 at 1-2. But the affidavit bears a signature date by the judge of January 12, 2017 – the same day the warrant was issued. MTS Ex. 1 at 000179. It appears the judge signed the affidavit and warrant at the same time. *Id.* at 000175, 000179. The fact that the two documents were not filed in the court's docket until January 18, 2017 – the same day the warrant was returned to the court and signed by a judge (*see* MTS Ex. 3 at 000191) – does not suggest the warrant is invalid. Defendant has cited no authority suggesting that a warrant is invalid on this basis.

### B.  December 10, 2018 Search Warrant.

Defendant notes that a December 10, 2018 federal search warrant for his previously-seized iPhone was to be executed by December 24, 2018. Doc. 113 at 2; MTS Ex. 5 at 1. He argues that extractions from the phone in fact were not completed until January 8, 2019,

and that all results of the search must therefore be suppressed. Doc. 113 at 2. The return for the warrant, however, notes that the warrant was executed when the phone's contents were emailed to an investigator on December 11, 2018, well within the period for execution set by the warrant. Doc. 122-1 at 2. And the warrant itself stated that the extraction process could take up to 90 days. MTS Ex. 5 at 5 ("Unless further permission is sought from the Court, the devices described in Attachments A [sic] will be imaged (to the extent possible) and/or searched for the things described above within the next 90 days."). The investigator's extraction was completed by January 8, 2019, well within the 90-day period. Doc. 122-1 at 2.

### C.   Seizure of Defendant's iPhone 7.

Defendant contends that his iPhone 7 was illegally seized from his truck without a warrant when he and his girlfriend, Starleigh Rhodes, were arrested on March 6, 2018 at the Williams Justice Center after leaving a court hearing. Agent Sophia Fong's report states that Rhodes was in possession of her and Defendant's phones when she was arrested, which would make the seizures lawful as incident to an arrest. Doc. 138-2 at 3. An Inventory of Seized or Impounded Property completed on the same day also shows that Defendant's black iPhone was taken by Agent Fong from Rhodes. Doc. 138-3 at 1.

Defendant argued vigorously at the hearing that Rhodes did not have his cell phone when she was arrested, and that videos of the arrest would show that his phone was seized illegally from his truck. The Court accordingly directed the government to provide all recordings and reports of the arrest. The Government subsequently filed an audio recording of Agent Fong's arrest of Rhodes, a body camera video of the arrest, and recordings of interviews of Defendant, as well as other reports and relevant documents. Docs. 135, 138. Two of the recordings are relevant in resolving this issue.

#### 1.   Body Cam Video of Arrest.

The Court has reviewed a body camera video of Defendant's arrest. Doc. 135, Ex. 5. About 30 seconds into the recording, Defendant is seen walking out the door of what appears to be a courtroom. Immediately behind Defendant is a dark-haired woman

whom the government identifies as Ms. Rhodes. *See* Doc. 138-1 at 3. She is holding an object or objects in her left hand, with a set of keys dangling below. The object or objects appear to be one or two cell phones, but the image is not clear enough to be certain. Her right hand is not visible. The video seems to corroborate – and certainly does not contradict – Agent Fong's assertion that Rhodes was carrying phones when she left the courtroom and was immediately arrested.

### 2. Recording of Starleigh Rhodes' Arrest.

The Court listened to the entire audio recording of the arrest of Starleigh Rhodes, made by Agent Fong. *See* Doc. 135, Ex. 3. The Court will identify relevant statements and events in the recording by minutes and seconds into the recording.

During her early discussion with Rhodes and before they walked to Defendant's truck, Agent Fong said she would hold Rhodes' phone and keys, confirming that Rhodes in fact had her phone when she was arrested outside the courtroom. 8:15. A few minutes later, Fong and another officer walked with Rhodes to Defendant's truck to get her purse before transporting her to jail. When they arrived at the truck, the other officer asked where in the truck the purse was located. Rhodes told him, he asked if she minded if he reached in and got the purse, and she said no. The officer then retrieved the purse. 10:40. These events occur with Rhodes present at the truck and in discussions with the officers, and provide no indication of any further search of the truck.

The officers and Rhodes then can be heard walking to a different location, at which point another officer asks Rhodes: "are both of these your phones?" 11:48. Rhodes says "the black one's Loren's." *Id.* This could not be a reference to two phones seized from the truck, as the recording already shows that Rhodes had at least her phone when she was first stopped. It appears more likely that the officers and Rhodes have walked back to the location where the phones were being held. A few minutes later, Rhodes again was asked about the two phones and said the black phone was Loren's. 16:30. When Agent Fong delivered Rhodes' belongings to her grandmother later that day, Fong said they were holding on to the cell phones. Doc. 135, Ex. 4 at 2:38.

### 3. Conclusion.

Defendant has presented no evidence that his iPhone 7 was seized from his truck without a warrant. The recordings described above appear to corroborate Agent Fong's report that the phone was seized incident to Ms. Rhodes' arrest.

### D. Duplicate Copies of Warrant.

Defendant contends that A.R.S. § 13-3915(D) required the state judge who issued the January 2017 warrant to file duplicate copies in court, but this statutory provision applies when a judge approves a warrant by phone. *Id.* In this case, the judge signed the warrant directly. *See* MTS Ex. 1 at 000175. Section 13-3915(D) does not apply.

### E. Motion to Suppress Conclusion.

Defendant has provide no basis for the Court to grant any portion of his motion to suppress, and the motion therefore will be denied.

## II. Motion to Dismiss (Doc. 112).

Defendant alleges that the government has engaged in serious misconduct in this case, warranting dismissal of all charges. His motion is full of adjectives and invective, such as when he characterizes the government's actions as "thoroughly beyond blatant insanity, diabolic, twisted, nasty, gross, disgusting, horrible, terrible, appalling, sickening, outrageous, dishonorable, disgraceful, and tyrannical[.]" Doc. 124 at 9. But these serious allegations are not supported by the evidence.

Defendant's motion and reply are confusing. The Court has done its best to decipher his arguments and match them with exhibits in the two binders provided by shadow counsel and the thumb drive discussed below.

### A. Standard for Dismissal of Charges.

Dismissal based on government misconduct is "limited to extreme cases in which the government's conduct violates fundamental fairness." *United States v. Gallarzo*, 696 Fed. App'x. 285 (9th Cir. 2017) (quoting *United States v. Gurolla*, 333 F. 3d 944, 950 (9th Cir. 2003)). Violation of fundamental fairness is an "extremely high standard" that requires a defendant to establish conduct "so grossly shocking and so outrageous as to violate the

- 6 -

universal sense of justice." *United States v. Hullaby*, 736 F. 3d 1260, 1262 (9th Cir. 2013) (quoting *United States v. Smith*, 924 F. 2d 889, 897 (9th Cir. 1991)).  Defendant bears a heavy burden when seeking dismissal on this basis.  *United States v. Venegas*, 800 F.2d 868, 869 (9th Cir.1986).

Ninth Circuit law identifies two sources of authority for dismissing criminal charges on the basis of misconduct.  The first arises from the Due Process Clause of the Fifth Amendment and is warranted when the government engages in "outrageous" conduct.  The government's misconduct must be "so grossly shocking and outrageous as to violate the universal sense of justice." *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993); *see Fernandez*, 388 F.3d at 1238.  Examples include cases where the government has engineered and directed a criminal enterprise from start to finish or the police have used brutal physical and psychological coercion against a defendant. *Id.*  In addition to shocking and outrageous misbehavior, a defendant must show that the misconduct prejudiced his defense. *See United States v. Rogers*, 751 F.2d 1074, 1077 (9th Cir. 1985); *see also United States v. Haynes*, 216 F. 3d 789, 796 (9th Cir. 2000).

The second source of authority is the Court's supervisory power.  *United States v. Bundy*, 968 F. 3d 1019, 1030 (9th Cir. 2020).  This power may be invoked in response to outrageous government conduct that "does not rise to the level of a due process violation." *Id.* (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)).  Still, there must be "flagrant misbehavior" by the prosecutor and "substantial prejudice" to the defendant. *Id.* at 1031.  As explained below, Defendant fails to satisfy either standard.

**B.    Alleged Alteration of Photos.**

Defendant's first argument refers to two extractions from an "ASUS computer" by Investigator Adams, and asserts that the extractions were unlawful. *Id.*  But Defendant never explains why he believes the extractions were unlawful. *Id.*[3]

---

[3] Counsel for the government noted at the hearing that the ASUS computer was seized pursuant to a September 6, 2017 search warrant.  That warrant was addressed during a previous hearing in this case.  The Court did not accept Defendant's argument that the warrant was invalid. *See* Doc. 107 at 2-7.

- 7 -

This argument appears to focus on two photographs, identified as 005.jpg and 006.jpg. *Id.* at 2. The photographs are of a deer at issue in Count 5 of the Indictment, which the government alleges was killed inside Grand Canyon National Park. The government contends that Defendant killed the deer inside the national park, returned at night to retrieve the deer, transported it just outside the park, and then took photos with it, all in an effort to make it appear that he had killed the deer outside the park. Doc. 121 at 4.

Defendant and the government agree that the metadata associated with photos 005.jpg and 006.jpg indicate that they were taken inside the national park, and that metadata for other photos taken of the same deer at about the same time indicate that they were taken just outside the park. Defendant contends that agents altered the metadata in 005.jpg and 006.jpg to obtain a wrongful conviction. Doc. 112 at 2.

The government asserts that Defendant misunderstands its theory of the case. It agrees that all of the photos of the deer were taken outside the park, consistent with its claim that Defendant transported the deer there after he killed it. Doc. 121 at 4. The government explains:

> The location in the two photographs [005.jpg and 006.jpg] – based on the visual area depicted in the photographs – appeared to match the location of other photographs, which had metadata indicating they were taken just outside the Park and had been taken around the same time. Investigators thus recognized the need to reconcile the discrepancy in metadata from the various photos. To do so, they asked National Park Service Agent Philip Oakes to go to the locations to help determine where the photographs were taken. As Agent Oakes documented in a report, his investigation led him to the conclusion that the photos were taken at the location outside the Park, not the location inside the Park.
>
> Investigators thus concluded that the metadata associated with the two photographs in question here was likely erroneous. And the United States has proceeded on that theory throughout this case; it has not argued that McReynolds took any photographs inside the Park.

*Id.* (citation omitted). A report by Agent Oakes confirms that he visited a site outside the park on February 8, 2018, and concluded that 005.jpg and 006.jpg likely were taken in that location. MTD Ex. 4.

Defendant has not shown government misconduct in connection with these photographs. Although the metadata discrepancy has not been explained, Defendant has provided no evidence that the metadata was deliberately altered by the government. Defendant does provide a February 5, 2018 email in which Investigator Adams enclosed photo 006.jpg and a pin-drop on a map showing the photo's location as within the park, along with the word "jackpot." MTD Ex. 2 at 1. But the Oakes report shows that three days later the agents confirmed that the actual location was outside the park. MTD Ex. 4. The Court cannot conclude from this evidence that the agents engaged in misconduct by intentionally altering metadata on the photos.[4]

**C.    Interview of Brittnee Bachstein.**

Defendant contends that agents misled, intimidated, and threatened witness Brittnee Bachstein during an interview about the alleged killing of the deer in Grand Canyon National Park. He specifically notes that agents showed her a photo of him cooking food at a campfire and told her the photo was taken in the park, which was not true. Doc. 112 at 2.

The government concedes that the photo was taken outside the park and states that "[t]he investigators were mistaken when they identified the photo as having originated within Park boundaries." Doc. 121 at 6. The government argues, however, that this single error does not require dismissal of the Indictment.

---

[4] Defendant argues that suspicion arises from the fact that the Oakes report was signed by Oakes's supervisor three minutes before it was signed by Oakes. MTD Ex. 4 at 1. But counsel for the government explained that this is normal procedure for electronic reports which must be approved by a supervisor before they are finalized by an agent. Defendant presents no contrary evidence. Defendant also argues that Adams scanned the ASUS computer twice, once on February 3 and a second time on March 23, 2018. Doc. 112 at 1; *see* Doc. )), MTD Ex. 1 at 2. He suggests that the second scan was somehow intended to cover up the fact that he had altered metadata on the photos. A Forensic Examination Report does show two scans, but provides no evidence of altered metadata. *Id.*

The Court has reviewed the entire transcript of Ms. Bachstein's interview (MTD Ex. 8), including the part where agents state that the campfire photo was taken in the park (*id.* at 15). Although the statement was incorrect, the Court cannot conclude that it rises to the level necessary for dismissal of charges. It does not show extreme or outrageous conduct. Nor does it reflect intimidation, threatening, or misleading of Ms. Bachstein. The Court will not dismiss charges on the basis of the interview.[5]

### D.  Allegations Against Agent Fong.

Defendant makes several allegations regarding Agent Fong. He asserts that she lied about the direction in which he shot a gun in order to obtain a sentencing enhancement in a previous case; that she did not seize his iPhone from his girlfriend, Starleigh Rhodes, but that it instead was taken from his truck without a warrant; and that she is married to Agent Parker, who has engaged in acts of harassment and wrongful conduct toward Defendant. Doc. 112 at 3-4.

In response, the government notes that the alleged misconduct of Agent Fong to obtain a sentencing enhancement – which the government contends was not misconduct at all – could not have caused prejudice, as required for dismissal, because the sentencing enhancement was not applied by the Court in Defendant's previous case. Doc. 121 at 7. The government is correct. The Court did not apply a sentencing enhancement based on Defendant having fired a gun in the direction of a populated area. *See* Case No. 18-CR-8052-PCT-DGC, Doc. 146 at 15-23 (sentencing hearing where Court declines to apply requested four-level enhancement). Defendant cannot show the prejudice required for dismissal, even if he could show that Agent Fong engaged in misconduct – an issue the Court need not decide.

Defendant contends that Agent Fong lied when she claimed to have obtained his iPhone 7 from Ms. Rhodes during her arrest outside the Williams Justice Center. Doc. 138-

---

[5] Defendants notes in his reply brief that the government entered into a letter agreement with Ms. Bachstein, in which she agreed to cooperate and testify and the government agreed not to use her testimony against her. MTD Ex. 25. Such an agreement, which is common in criminal cases, does not show improper conduct.

- 10 -

2 at 3. As described above, however, audio and video recordings of the March 6, 2018 do not contradict Agent Fong's account.

To support his claim that agent Fong is biased against him, Defendant further asserts that she is married to U.S. Forest Service Agent Parker. He describes an alleged chase Parker made of Defendant and others on U.S. Forest Service roads, a "confrontation" that occurred when Parker pulled them over, and Parker's alleged tracking of him, improper seizure of a dead elk, and other wrongful conduct. Doc. 112 at 4-5. None of this relates to the charges in this case and therefore could not have caused the prejudice required for dismissal of charges. Further, the Court reviewed two videos of the stop by Agent Parker provided by the government, both of which show that Parker dealt with Defendant and his companions in a calm and professional manner. *See* Doc. 135, Exs. 1-2. The Court cannot conclude that conduct by Agents Fong or Parker warrants dismissal of charges in this case.

### E. Structuring Charge Allegations.

Defendant is charged in Counts 7 and 8 of the Indictment with structuring financial transactions in violation of 31 U.S.C. § 5324(a)(3) and (d). Doc. 1 at 3-4. He cites Financial Crimes Enforcement Network forms from 2013 and 2016 (MTD Ex. 14), and argues that it is not clear who completed the forms or provided the information about Defendant's alleged structuring. He argues that alleged inconsistencies in the reports show they are not credible. Doc. 112 at 6.

Issues of credibility and disputes of fact must be resolved at trial. *See* Doc. 95 at 6. When a pretrial motion to dismiss "raises factual questions associated with the validity of the defense, the district court cannot make those determinations." *United States v. Schafer*, 625 F.3d 629, 635 (9th Cir. 2010) (citing *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986)). "Doing so would invade the province of the ultimate finder of fact." *Id*. (internal quotation marks and citation omitted).

/ / /

### F. Reply Brief Arguments.

For the first time in his reply brief, Defendant raises various arguments regarding false statements allegedly made to the grand jury. Courts generally do not consider arguments made for the first time a reply brief. *United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006) ("Issues raised for the first time in an appellant's reply brief are generally deemed waived."). The Court will deny Defendant's grand jury arguments for this reason.

In addition, however, the Court has reviewed Defendant's assertion and finds that they do not provide a basis for dismissing the charges. Defendant carries a "heavy burden" in challenging the Indictment. *United States v. Busher*, 817 F.2d 1409, 1411 (9th Cir. 1987). "He must demonstrate that the prosecutor engaged in flagrant misconduct that deceived the grand jury or that significantly impaired its ability to exercise independent judgment." *Id*. (quoting *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983)). He also must demonstrate that the misconduct prejudiced him. *See United States v. Struckman*, 611 F.3d 560, 574–75 (9th Cir. 2010) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988)). Further, "incomplete evidence before the grand jury [does not] detract from the resulting indictment." *United States v. Hickey*, 367 F.3d 888, 894 (9th Cir. 2004), *opinion amended on denial of reh'g*, 400 F.3d 658 (9th Cir. 2005); *United States v. Isgro,* 974 F.2d 1091, 1096 (9th Cir. 1992) ("[P]rosecutors simply have no duty to present exculpatory evidence to grand juries.").

Defendant challenges several items of testimony before the grand jury:

1. Investigator Adams testified that undercover agents had a discussion with Defendant about how much it would cost for a guided hunt on Forest Service land in Northern Arizona. MTD Ex. 20 at 5. Defendant asserts that the discussions concerned hunting on land that is not governed by the Forest Service. Doc. 124 at 2. But the question and answer before the grand jury, even if incorrect (an issue the Court need not resolve), was only introductory and led to questions on the amount the agents were to pay for the hunt. MTD Ex. 20 at 6. It was not prejudicial to Defendant.

2. Defendant disputes Investigator Adams' testimony that the agents paid him for the hunt. *Id.* He asserts that they paid only $1,500 to secure a reservation, and that he did not charge them the rest of his fee due to adverse weather conditions at the time of the hunt. Doc. 124 at 2. But Investigator Adams testified that they paid Defendant $1,500. MTD Ex. 20 at 6. The testimony was accurate.

3. Adams testified that on the first day of the hunt, Defendant and the agents looked for deer on the Coconino National Forest and Kaibab National Forest. *Id.* at 7. Defendant argues that they crossed national forest land to look for deer on private land at Perrin Ranch. Doc. 124 at 3. The activities concern looking for deer, not any of the conduct charged in the Indictment. Even if technically incorrect (an issue the Court need not decide), this testimony was not prejudicial.

4. Adams testified that Defendant told the undercover agents that he used Starleigh Rhodes as an excuse to get a Remington rifle. MTD Ex. 20 at 8.[6] Defendant asserts that this is an incomplete statement (Doc. 124 at 3), but incomplete evidence is not a basis for dismissing charges, as noted above. And the rifle in question is not at issue in this case. Defendant pled guilty to unlawful possession of the rifle in the predecessor case.

5. Adams testified that Defendant shot a protected burro with the rifle on January 10, 2017, and shot another with a bow the following day. MTD Ex. 20 at 9-10. Defendant disputes the truth of this testimony, but then appears to admit that one of the burros was shot and died. Doc. 124 at 3. Defendant asserts that Adams left out crucial information about the shot that killed the burro (from a great distance and into extremely dense brush), but his disagreement with the evidence is not a basis for dismissing the charges against him.

6. Defendant asserts that Adams lied when he testified that Defendant, upon his arrest, stated that he did not have a permit to conduct commercial guiding activities. MTD

---

[6] Defendant later asserts that Agent Fong provided the same testimony before the grand jury. Doc. 124 at 7.

Ex. 20 at 11.  Defendant cites Exhibit 24 as contradicting this testimony, but the exhibits provided to the Court do not include number 24.

7. Defendant asserts that Agent Kyler Carpenter falsely testified that Defendant opened an account in the name of McReynolds Antler Company in April 2013, when in fact it was a reactivated account from 2008.  Doc. 124 at 5.  He presents no evidence to support this assertion and does not clearly explain why this allegedly false statement prejudiced him.  *Id.*

8. With respect to the structuring charge in Count 8, Defendant asserts that Agent Carpenter falsely testified that there were three transactions on July 5, 2016 ($9,000, $7,000, and $9,000), when in fact there were only two ($9,000 and $7,000).  Doc. 124 at 6.  The government agreed at the hearing that this was error.  Defendant does not explain why this prejudiced him, nor does he dispute that a structuring charge can be based on two deposits of $9,000 and $7,000.

9. Agent Carpenter testified that Defendant collected antlers inside Grand Canyon National Park as shown by photographs of antler collection activities on his phone that included GPS locations in the park.  MTD Ex. 29 at 8-9.  Defendant argues that photos of antlers lying on the ground, or of someone posing with them, does not prove that they were removed from the park.  Doc. 124 at 6.  Defendant also disputes that antlers he sold in 2013 "could have been among those that were collected from Grand Canyon National Park" as Agent Carpenter testified.  *Id.*  This kind of dispute about the sufficiency of the evidence does not warrant dismissal of charges under the standard described above.

10. Defendant contends that Agent Fong "deliberately leaves out crucial facts pertaining to Starleighs [sic] Rhodes' firearm that occurred during its purchase" (*id.*), but as noted above, incomplete grand jury evidence is not a basis for dismissing charges.

11. Defendant disputes Agent Fong's testimony that he alone had access to an area of his property where certain items of evidence were found.  Docs. 124 at 7, MTD Ex. 31 at 11.  But this kind of evidence dispute does not warrant dismissal of charges.

Finally, Defendant asserts that agents tampered with witness Bob Kulina, but he does not explain the nature of the alleged tampering or how it affects this case. Doc. 124 at 10. A thumb drive provided to the Court includes a recorded interview of Bob Kulina, with no exhibit number. It is listed as 002713 (191028_002).MP3 on the thumb drive. The interview is by phone and conducted by two officers who are cordial and polite. It reflects no effort to intimidate or tamper with the witness or change his testimony. In fact, Defendant correctly asserts that Kulina said favorable things about him in the interview.

**G.     Hearing Exhibit Issues.**

At the beginning of the hearing on September 23, 2020, Defendant made reference to exhibits presented at a previous hearing on June 4, 2020. During the exchange that followed, Defendant stated his belief that the Court had received and reviewed a thumb drive of exhibits presented at the June 4 hearing, and asked the Court to consider them in connection with the current motions. The Court stated that it did not recall a thumb drive and would review the transcript of the June 4 hearing.

The Court reviewed the Court's LiveNote transcript, but found no suggestion that a thumb drive had been submitted to the Court. The hearing included testimony from Investigator Clint Adams with the Arizona Game and Fish Department. During cross examination, Defendant attempted to question Adams about a portion of a report Defendant thought was relevant, but he could not find it. The Court explained: "We are at the hearing now so you've got to present the evidence you think supports your motion to suppress." Court's LiveNote Transcript, 6/4/20, at 51. Defendant questioned the witness and presented some exhibits, but he never presented a thumb drive to the Court and never asked the Court to review a thumb drive. Nor was a thumb drive ever placed in the record.

Shadow counsel stated that he would locate and file the thumb drive. He provided a drive to the clerk's office on October 2, 2020. The Court personally reviewed the more than 120 items on the drive, which are not numbered as exhibits. Shadow counsel provide handwritten notes with the thumb drive, apparently from Defendant, but they do not

correspond to the thumb drive's contents.  Nor do the documents listed in Doc. 102 – a list of exhibits for the June 4, 2020 hearing – correspond to the thumb drive's contents.

The thumb drive includes motions and replies filed by Defendant, transcripts of interviews, recordings of interviews, photographs, a video clip of Defendant attempting to shoot a balloon, excerpts from a Sportsman Warehouse security video, recordings of calls between Defendant and the undercover agents, and text messages between them.  These materials provide further detail regarding some of the events addressed in Defendant's motions, but they do not show misconduct on the part of the government.[7]

**IT IS ORDERED:**

1. Defendant's Motions to Suppress (Doc. 113) and Dismiss (Doc. 112) are **denied**.
2. Defendant's motions to seal exhibits filed in the Clerk's office (Docs. 131, 136) are **granted** because, as discussed at the hearing on September 23, 2020, they contain unredacted personal information.
3. The Court will hold a status conference on **October 14, 2020**, at **4:00 p.m.**  The purpose of the hearing will be to discuss the feasibility of the December 8, 2020 trial date, and steps that must be completed before trial, in light of Defendant's preparation and the ongoing COVID pandemic.

Dated this 6th day of October, 2020.

*David G. Campbell*

David G. Campbell
Senior United States District Judge

---

[7] The Court recognizes that Defendant is at a disadvantage as a self-represented litigant trying to review and use the voluminous discovery disclosed by the government in this case.  The Court warned Defendant of the risks and challenges of representing himself when it gave him a *Faretta* warning on January 6, 2020.  Doc. 49.  The Court has tried to assist Defendant in preparing his case, including arranging for him to have a laptop computer and all of the government's discovery at the facility where he is housed, and appointing shadow counsel and a paralegal to assist him.  The Court has considered his motions and exhibits as carefully as possible.  They do not come close to make the showing required for suppression of evidence or dismissal of charges.